Mr. Kluge, it's good to see you this morning. Please come forward and speak with us. Thank you, Your Honor. I believe Mr. Jeff said I could have his time. Is that true? Nice try. Your Honor, may it please the Court, in Hamlet, the character Lord Polonius famously says to his son Laertes, never a borrower or a lender be. If Shakespeare were writing today, he might add, and don't be a closing agent either. Because the burdens of policing that were placed on Ms. Musselwhite in this case rise to a level that is really greater than one would ordinarily expect of someone who is not a certified lawyer or something like that. But before I get to her case in particular, I want to address what I think is the most important issue in this case. What we're primarily here to address, which is the denial of an unopposed motion to vacate, the improper transfer of a case by a judge to a judge as to whom an unopposed motion to recuse was filed and granted. This is not, this does not fit into the pattern of cases in which one judge decides that, just to transfer to another judge. It's not, it doesn't fit into the ordinary pattern of a case where a recuse. I thought, though, that Judge Jarvie, is that how he pronounces his name? Yes. Familiarized, made it clear, though, that he had familiarized himself with everything that had been filed, had independently reviewed it, and had reaffirmed the decisions of the earlier judges, and that that would cure any issue. Why is that not right? It's not right because what he purported to do, this Court has repeatedly held, is not possible in the context of a case in which multiple hearings and evidentiary hearings have been held and no transcripts have been prepared. Well, first of all, we haven't really held that in this context. And second of all, though no transcripts have been prepared, I think we all know that the district judges have access to the rough drafts of the transcripts from their court reporters. So we don't know that he didn't review that. I mean, he said on the record that he reviewed the decisions and agreed with the reasoning, and he reviewed the whole thing de novo. So how do we know that he didn't even look at that? I mean, there are two separate issues there. There's one, did he look at the transcripts, which we don't know, and two, if he didn't look at the transcripts, in this case, does our case law apply? I mean, it seems to me that the case law is a slightly different situation. First of all, would the Court use the word context? I mean, this is not a recurring context. This is the only time this has ever happened. You have a judge who recuses, their motion to recuse is filed within the window of the motion to reconsider his denial of the vacating of the original improper transfer. That's never happened before. Immediately recuses and rules on the case in the course of recusing. What Judge Jarvie did, again, he's coming in from Iowa. He flew in from Iowa, I believe, the night before. He clearly did not have any access to any rough drafts. There were no rough drafts. The hearing we had, we had a very lengthy hearing on the first day of trial. It was absolutely clear that he didn't have any inkling of what happened at the evidentiary hearings. The way he handled that matter was to say, well, I would have denied all the evidentiary hearings. That doesn't mean anything. We had a suppression hearing. We had a suppression hearing that was completely justified by the record. Have you appealed anything on the suppression hearing? Pardon me? Have you appealed anything on the suppression hearing? I've appealed everything, every order that was entered. I have appealed. Is there a specific issue you've raised, though, with respect to the suppression issue? No, there is not a specific issue other than this. But this is a very important issue. This is a fundamental issue. This goes to the whole trust in the system that exists. But what I'm saying is, if he said he reviewed all of this, he would have adopted the exact same reasoning. And you're not raising any specific issue about what he did that was wrong or unfair with respect to the actual legal ruling. Judge, I am complying with the law of this circuit that was applicable throughout the time that I was filing these motions. With the law of this circuit, I have to show the potential prejudice from the recused judges, from the biased judges' ruling. In none of the other cases where this Court has said you can go forward like this, has there been a bias shown? Has there been a recusal shown? I've timely, properly showed the judge should never have had his hand in this case. Okay. We understand that. That's the prejudice I have to show. But the judge did recuse. Yes. And the new judge got the case, had a record before it, and said, I've independently reviewed everything. I would reach the same decision and reaffirms all of those decisions. Aren't you at that point required to show us which of the decisions he reaffirmed could not have been handled that way and that it was so unfair as to deny your client due process of law? And without that showing of exactly what that is and how that happened, how are we to deal with it? Well, I have done that. I mean, first the overarching principle, and I think the way the Court stated it is differently than the way I was planning to answer it. But the overarching principle is if I had to show that there was suppression error, then what's the good of having recusal in the first place? What's the good of having an unbiased judge in the first place? It doesn't matter. It doesn't matter you have a biased judge. You've still got to show error. But I'm just trying to answer it. Okay. But just to refocus on what Judge Pryor is saying, I think we understand that if you were to show that he had to recuse himself and he didn't, and his judgment as he issued it stood without an independent review, then absolutely, obviously there would be prejudice just from that. Right. But the problem is there's a second step here. And the second step is a completely independent judge with no recusal issue has said he conducted a de novo review of everything that occurred. So why don't you then have to show that his decision had some kind of problem to it? His decision, you're referring to the second judge's? Yes. Okay. The first judge's decision had tremendous problems with it because it didn't look at any of the hearings. There were not a single incipient transcript. There was nothing. The judge acknowledged that in effect there. So he could not have done it. What he said to the parties was not true. I have conducted an independent de novo review. I explained to the court, you can't do it that way. He says, I'm doing it that way anyway. I said, well, are you vacating this? What are you doing? He says, call it whatever you want. I'm reinstating the ‑‑ I'm not going to grant your motion. Call it whatever you want. That's the ruling that I got. That's not fairness. That's not an independent review. That's simply not. But to the point of Judge Pryor's question, what did I show that was erroneous? What I showed that was erroneous was that the original judge denied me an evidentiary hearing when I first had the motion. I had the basis for an evidentiary hearing, and he should have granted me an evidentiary hearing. And if we'd have had the evidentiary hearing, I wouldn't be here today. Okay. I think we understand your argument, Mr. Kluge. And you have saved a couple of minutes for rebuttal. Mr. Lefferman? Please, the court. Michael Lefferman on behalf of James Sotolongo. If I could start with a baseball analogy quickly. My father and my son and I go to a baseball game every year. Last week, we went to Marlin's game down in Miami. When I walked in, someone at the entrance gave me a program and a scorecard. And the scorecard had the rules on the back. And I sat there throughout the game, and I scored the game, balls, strikes, runs. And I was relying upon the rules as I was doing that. Jurors aren't given scorecards when they walk into a courtroom. Jurors are supposed to listen to all of the evidence, all of the arguments, and only at that time are they— Other circuits, including the circuit where Judge Jarvi serves, allow for preliminary instructions. And in a complicated case, I'm not sure what the harm is in giving a jury preliminary instructions to aid it in its understanding, particularly financial crimes kinds of cases, so that as the evidence unfolds, the jury has a better understanding of why certain evidence may be important or not. Going back to my baseball example, I could never have scored the game properly if I didn't have all the rules. The jury, if they were going to be given a scorecard in this case, had to have all the rules. But they only had the government's rules. They only had the elements of the government's offenses. They were missing the defendant's main rule, which was the good faith instruction. And that's the prejudice in this case. There are a lot of cases where the good faith defense instruction is not given, but the government's burden of proving intent is correctly explained to the jury. But this is a case where the good faith defense is, in fact, given at the end of the case to the jury, and they're properly instructed about it, and intent was given from the beginning. Here's the key, and it's the question that the jury asked in deliberations. Deliberations is a two-week trial. They had those written instructions with only the elements and not the good faith instruction for those two weeks. Deliberations began on Friday morning, all day Friday, picked up again on Monday. So almost two full days of deliberations, they submit a question. We have a concern about count 14, the very last count in this case. We don't know which set of instructions to use. There's conflicting language. It's at that point in time that defense counsel moves for a mistrial, says you never should have let them have the written instructions all along. The judge denies the request for mistrial, finally tells the jurors give back those written jury instructions, and 28 minutes later they come back with their guilty verdicts except for that particular count that they asked a question on, which they found my client not guilty of. So they had been relying upon both sets of instructions. We know for a fact because of their question, and I submit it's reasonable to assume that they relied upon both sets of instructions all the way through all the counts. But their question was specific to a count on which your client was acquitted. Yeah, and I think the reasonable assumption there would be that they relied upon both sets of instructions, not knowing that good faith did or did not apply for counts 1 through 12, all the counts for which my client was convicted of. If they had come back five minutes in on count 1 and asked that question, I'd have a hard time arguing prejudice. They came back after two days of deliberations, 28 minutes later came back with their verdicts. That's not fair. This court has spent a lot of time on these pattern jury instructions. But it's one count that they were apparently hung up on, right? Judge, I think the reasonable assumption is they'd already reached their conclusion on all the other counts by the time they asked about count 14. Because they considered that easy. Because they spent two days. The only one that they had a real question about is one on which your client was acquitted. I cited, too, the Third Circuit Alexander case, where in that case it involved an improper reasonable doubt instruction. And the court said when it's not clear whether the jury relied upon the improper instruction or the proper instruction, we have to assume in that situation that they relied upon the improper one. We don't have to assume much in this case. They asked the question after two full days as to the last count. And acquitted your client on it. And I submit, had they been told only to rely upon the final instructions from count 1 through count 12, they would have acquitted my client for all those counts as well. They didn't have the correct set of rules throughout the entire trial. They didn't even know which set of rules to use for counts 1 through 12. They were only finally given that instruction and actually told to give back the improper written instructions for count 14. They came back with a guilty verdict 28 minutes later. Again, I've relied upon the New York Compton case. The government concedes, and I appreciate their candor, there aren't a lot of cases, if any, that are on point on this issue. But the New York case hit the nail on the head. By permitting, even encouraging the jurors to refer to the written outline during the trial, the court invited piecemeal, premature analysis of the evidence. The court's outline, in effect, served as a checklist against which jurors could measure the evidence as it came in. In that case, though, the instructions on burden of proof and those weren't given, right? The issue here, my analogy to that case is no good faith instruction. They were given all the elements but weren't given the good faith instruction. It was untimely, right? The request to give a good faith instruction, the district court said was untimely. If I can respond to that, I think, number one, to say that it was untimely prior to the beginning of the trial is simply contrary to the e-mail. And the e-mails are attached in the appendix. I provided those to the court. The first e-mail, the judge simply says, I'm going to tell the jurors about the elements. He doesn't say I'm going to give them the elements in a written form. The only thing he said he was going to give them in a written form was the overt acts. Defense counsel objected to that. Then when it became clear at the end of the first day of the trial that, oh, my goodness, they're actually being given these written preliminary instructions with the elements, that's when defense counsel objected and said, wait a minute. We asked, please collect those back. They can't have those for the next few weeks. But the district court said submit something right after court that day, right? Yeah, so then the defense counsel said we need the good faith instruction. The judge says give it to me today and we'll discuss it tomorrow morning. Next morning, before the jury talled in, before 9 o'clock. That's when they bring it in. That's when the defendants bring it in. Defense counsel says, judge, here's our good faith instruction. Judge says, why didn't you submit it yesterday? And the defense counsel says, your honor, I'm out of town. It was a Jewish holiday. And, in fact, it was Passover that night. For the judge to say. Why wasn't that brought to the attention of the district court that day? The day before? Yes. I submit, your honor, that it was in no way clear that if you don't get it to me by midnight tonight, I'm not going to consider it. I would think it's reasonable for defense counsel, again, with a Jewish holiday and Passover, to say, look, I'm out of town. This wasn't what I was focusing on. I'm going to get this to them way before we start. There would have been no prejudice to anyone. The jury had not been called back in. The judge could have taken the additional five to ten minutes to discuss that instruction and say, yes, I'm going to give it. Let's pull back those improper preliminary written instructions. Let's add in good faith. Give them back the written instructions. And there wouldn't be an error. Part of my concern is that our standard of review on that question is abuse of discretion. For the timeliness? Yes. And, your honor, I would submit that under those facts, with the defense counsel saying you're Where defense counsel is told I want it that day and Not that definitively, your honor. Okay. Why isn't it that definitively? Give me something today and we'll discuss it tomorrow. Was the tone in which the judge said it. Defense counsel very I mean, I would expect that I needed to provide it that day if that's the tone that was given. And then when the judge said, why didn't I give it that day? Your honor, I'm celebrating Passover. Can I submit it tomorrow morning? I have no idea if it just slipped his mind at that point when he was making that argument in court. But the next morning when the judge does ask, what's your explanation for not submitting it? And he immediately says, judge, it was Passover. That's a reasonable explanation. And more importantly, here we are at roughly 8, 830 in the morning. You have it. The jury hasn't even come in yet. Can we take the extra five or ten minutes to go through it now? It would be an abuse of discretion to keep out the most important defense instruction in this entire case. My client's entire theory of defense was good faith, your honor. I'd ask the court to reverse on that basis. Thank you. Mr. Efferman, you've saved a minute for rebuttal. Mr. Miss Miss Krigsman. I'm sorry. Good morning, Your Honor's counsel. Shuri Krigsman for the United States. May it please the court. Your Honor's appellants Sotolongo and Musselwhite have raised a veritable cornucopia of claims in this appeal. But ultimately, the record firmly establishes that no reversible error occurred in the pretrial proceeding and that the defendants received an eminently fair trial. Let me ask you, I'm sorry to interrupt, but let me ask you a question about the suppression hearing. Yes, Your Honor. Would you agree that for the suppression hearing there needed to be an evidentiary hearing? No, Your Honor, I would not agree. Why not? Because the only issue raised in the motion to suppress was essentially a legal issue. And that issue was the defendants claimed that because the search warrant had been conducted at a premises where two businesses were located, one of which was Waverly Media, a press outlet, that the FBI somehow exceeded the scope of the Fourth Amendment and conducted an unreasonable search by going into this premises to seize business records belonging to Waverly Property, which was co-located at that premises. And, in fact, if we look at the court's order denying the motion to suppress, we see that at no point in that order does Judge Dalton make a single credibility finding. He does not talk about disputed facts regarding the execution of the search. Instead, he focuses on the four corners of the search warrant affidavit. He describes why the four corners of the affidavit established that FBI agents were justified in going to this premises to search for these very particular business records belonging to a business that had been involved in the mortgage fraud conspiracy. And if we go back and if we actually review the transcript of the suppression hearing, we see that there really wasn't a suppression hearing like we're used to. The agent testified. He testified about how the search team went into the premises and searched for the business records. There was no disputed, there was no witness called by the defense. There was no disputes about what types of documents the government had actually seized from the premises. In denying the motion to suppress, Judge Dalton said, it is inconsequential that business records belonging to Waverly Property happen to be co-located at a premises of Waverly Media. Furthermore, in the order denying the motion to suppress, Judge Dalton also determined that Appellant Musselwhite, who had moved to suppress the item seized during the course of the search warrant, that it was doubtful if she even had standing to challenge the seizure of the evidence. Because she was an individual, this was a search warrant executed at the premises of a corporation. She didn't have a business there. She had no personal belongings there. So the motion to suppress was denied on purely legal issues of law, not based on disputed issues of fact or on credibility findings. And if we look at the cases that Appellant Musselwhite has cited in her briefs, and the ones she relies on today, we see that all of them, to the best of my recollection, related to cases discussing how a district court may or may not reject credibility findings determined by a magistrate judge. And those rulings are all made in the context of the magistrate judge's act, not in this context. Now, at one point during the course of the proceedings, Mr. Kluge relied on the Caulfield case to insist that Judge Dalton had somehow, that Judge, excuse me, Judge Jarry had somehow erred in ruling De Novo on the motion to suppress without having a transcript of the hearing. But the Caulfield case is exceptionally inapposite here. The Caulfield case did present that sort of paradigmatic motion to suppress where there was a warrantless seizure of evidence. Officers came in and took a defendant's luggage without a warrant. Defendant claims, you took my luggage without consent. Law enforcement officers argue that property was abandoned. Law enforcement officers testify. Defense witnesses testify. There are very express credibility findings made in that case. The Caulfield case does not establish the premise that the appellants urge here today. There was no reason. Ms. Crickton, can I turn to another topic now? I wanted to ask you about some of the substantive counts. Yes, Your Honor. And specifically with regard to Stephanie Musselwhite. Go ahead. So as I understand it, in the overt acts, what you say she did wrong was she signed off on a false HUD-1. Is that, I mean, maybe I'm over something. I'm just trying to marshal the evidence and be sure I understand it. I think that's the key piece of evidence showing her complicity in the conspiracy and the substantive acts, Your Honor. And then the two ways in which, as I understand it, you say it was a false document are, one, she took money from someone other than the borrower. That's one part of the analysis, Your Honor, yes. Okay. And then the other thing is that she said money was paid at closing and it wasn't paid at closing. Yes, Your Honor. And I would argue that's the more compelling reason. Okay. Is there anything else other than, I mean, in terms of the false HUD-1, is it those two things primarily that are going on? Yes, Your Honor. And I would emphasize that, of course, the HUD-1, on the HUD-1 there's line 303 with the cash to close obligation. I have a question about that. So maybe we're talking about two different things. The HUD-1 says the amounts can be paid by or on behalf of the borrower, right? Yes, Your Honor. I mean, so the fact that somebody else came in with money that didn't come out of their account would not mean that the HUD-1 was false, right? It would depend on the terms of the loan, Your Honor. I think if gift funds were permissible, that the borrower could, in fact, take funds from a third party. I think what the problem – You're saying that's different from the lender? I'm sorry, Your Honor? The third party that would have to not be the lender? Yes, Your Honor, of course. The lender presumes that what the borrower comes to the table with are not the lender's funds to begin with. I got that. But in terms of whether or not what she did was in keeping with the HUD-1 document, I mean, it does allow money from someone other than borrower. And again, Your Honor, I think the testimony in the trial was a little bit back and forth on that. I think it depended on the terms of the specific loan, whether it was a verified asset loan, for instance. And there were a couple that were verified asset. So I have some more questions. I don't want to cut off your answer if you have something else you want to say about that. I would just emphasize that Judge Jarvie dealt with this in the motion for judgmental acquittal when the United States rested. And he said that regardless of whether there was a requirement or not that the closing money actually come from the borrower, none of the lenders would approve what happened here, which was that the borrower's closing money actually came from the lenders, and Ms. Musselwhite's participation was essential to making that work. But that's a separate question than whether or not the HUD was false, right? No, I disagree, Your Honor. What the lender would have accepted or would not have accepted is different than what the HUD says, the HUD-1 says. You disagree with that? Well, but the HUD-1 represents that there was a certain amount of cash to close that was brought to the closing table and that was tendered on the settlement date. Okay, so now you're going to the money at closing as opposed to where the money came from. Yes, Your Honor. Okay. Well, so I was reading, I don't know how to pronounce his name, Rafai, is that how you say his name? I think so, Your Honor. So I read his testimony on cross-examination and what, I mean, it's kind of rambling, as I guess transcripts often are. But my takeaway from this, he says he doesn't remember what date he gave her the check with regard to counts 4 and 5, the 15 Granville Circle, the closing that was on March 30, 2007. Am I missing something about that? I mean, I'm looking at the cross-examination and he says, I don't remember what date I gave her the checks, right? Your Honor, you're right. His testimony was a little bit all over the board, but of course, as we know, the credibility determinations are exclusively within the province of the jury. But did he ever, I mean, is there any more direct evidence on that than what I just read? I think what he did say with respect to those first two, the first two transactions that he closed on March 30, 2014, he said he didn't remember exactly when he gave her the money, but if he brought the personal checks on the date of the closing, he had an agreement with her that she wasn't going to cash them. She knew not to cash them. Yes. But in that instance, she did cash them and the check bounced, right? Correct. And then she went back and did another deal with him a couple months later. Well, okay. And as I recall, that closing was on a Friday. She deposits the checks the following Tuesday and they bounce on that 15 grand roll. I think it was either a Monday or Tuesday, Your Honor. Yes, that's correct. Okay, okay. And so just another question about that, just to be sure. So on the substance of counts, as I understand it, counts five, and I realize this is asking you to remember it. Counts five, which was the second loan on 15 grand roll circle. Count seven, which was the second loan on 397 Silver Beach Drive. Count nine, which was the second mortgage on 1616 North Atlantic Avenue. And count 11, 2721 Atlantic Avenue. Those were all second mortgages, right? Yes, except for that last property, the investment property, the 1006-1008 property. Each of the others on the substantive bank fraud counts had a first mortgage and a second mortgage. And so on the second mortgage, the borrower wouldn't be coming to the closing with money, right? I mean, the person getting the mortgage wouldn't be, wouldn't arrive at the closing with a check because it's a second mortgage. Isn't that, I mean, I'm just. I can't, and Your Honor, I can't remember from the HUDs, from those precise HUDs, whether there was any money that was meant to be brought to those closings. But the lender would have made the second, and they were the same lenders. The lenders, I believe the testimony was the lenders would make the second mortgage loan based on the terms of the first mortgage loan. But, I mean, if what you're charging these people with is, look, you took, I mean, something about the money that was brought to the closing wasn't right. Either it wasn't yours or there was some agreement that it wasn't going to be deposited until later. Then how would that apply if there was no money necessary to be brought to the closing because it was a second mortgage? They're just putting another lien on the piece of property. Do you understand? Yes, because what essentially happened in those second mortgages was that the bank didn't end up loaning 100 percent, as is typically, or close to 100 percent, as is typically the case with these second mortgage loans. It ended up loaning 120 percent or 130 percent because the borrower's funds had already been plowed back into the first mortgage. So the borrowers ended up having no skin in the game whatsoever, which is not the deal that the banks had entered into to begin with. And also, the JURAT. Will it be apparent from the HUD ones, though, that with respect to the second mortgages that Muscle White had been involved in falsifying those? There's going to be a HUD one for the second mortgages, too? Yes, Your Honor. And so her conviction would be dependent on those having been falsified. Is that right? Yes, Your Honor. What was false about them? I would argue, Your Honor, that they were falsified because the funds were not dispersed as specified on the HUD one and that the closing agent had not acted in the bank's interest, which it is required to do under the closing instructions for all these loans. But what about your second argument makes it false? I'm sorry, Your Honor. You said that the closing agent had not acted on behalf of the bank. In the bank's interest. Right. What about that makes it false? Makes the HUD one false. Well, then, Your Honor, and I'm sorry, I've forgotten. Also, with respect to counts 4 through 14 for Ms. Muscle White and counts 2 through 14 with respect to Mr. Sotolongo, or 2 through 13 with Mr. Sotolongo, there would also be, the jury could have found aiding and abetting, that Ms. Muscle White had aided and abetted false statements because she knew that there was a course of dealing here where these borrowers were coming to the initial closing table without the proper funds to close, and she was allowing them to funnel the seller's proceeds back into the purchase. So there's an aiding and abetting theory there as well. So it doesn't just apply to the HUD ones. It would apply to the other documents. Now, if I could turn, is there any other questions on this issue? No. You've been answering a lot of questions from us, and if you would like to address the point Mr. Ufferman raised, you certainly can have a couple minutes to do that as each of them were given a couple of extra minutes. Thank you, Your Honor. With respect to the preliminary jury instructions, I would first draw the Court's attention back to the controlling precedent, the Bynum case. In that case, the Court dealt with preliminary jury instructions that included the elements of both conspiracy and substantive fraud counts. Those elements were included in those instructions. The Court said that not only was it not error to give those instructions, but it's a well-reasoned modern trend to give preliminary jury instructions with the elements. Now, if we go specifically to this… Was there an abuse of discretion, though, not to allow the defendant, after his counsel had had a religious holiday the night before, to submit a good-faith instruction the next morning? Obviously, it cannot be, Your Honor, because controlling precedent says that it's okay for the Court to give the elements of the offense. Good faith is not an element to the offense. Defendant is not entitled under other controlling precedent in this Court to a good-faith instruction until he or she has established a foundation in the evidence or a basis in the facts. But doesn't it seem like there's something unfair about the idea that the jury can sit there with all of the instructions that are sort of the roadmap to the government's case? Because, I mean, the overt acts or whatever are in there. And by definition, the defense can't be in there because the instruction can't be given until there's evidence to present that instruction. So, I mean, preliminary instructions are given all of the time, but there's something different, it seems to me, about giving the written instructions. Maybe it's error and maybe it's not error to give the written instructions to the jury, but it seems like there's something unfair about letting the jury hold on to what are essentially the pro-government instructions and not allowing those to be supplemented until the very, very end of the trial with the defense instructions, and even then allowing the jurors to hold on to the original version of instructions as well. I mean, there's something about it that's troubling. Your Honor, I thought about this a lot in preparation for the argument, but it ultimately occurred to me, well, first of all, of course, the judge instructed the jury to consider the instructions as a whole, and we know that jurors are presumed to follow the instructions. But secondly, I think it's maybe not correct to think of these preliminary instructions as somehow unfair to the defense because the court – I looked at the preliminary instructions last night, and I think maybe on six different occasions the court emphasizes burden of proof, presumption of innocence, keeps telling the jury over and over and over, it's the government's burden of proof. This is what the government has to prove. The government has to show that the defendant did this willfully, that the defendant did this knowingly. Proof beyond a reasonable doubt, all that. So your point is that those aren't pro-government instructions. If anything, they're explaining the tough burden the government bears. Yes, Your Honor, and just one more point on that. Good faith is a negation of an intent element. So what if – what I was thinking about in preparation for the argument was what if the defendant decides, you know what, those government witnesses aren't testifying quite like the government would like them to? I'm not going to say anything because I don't have to. If the jury had already been instructed on good faith, they would be sitting there during the whole trial waiting for the defendant to offer something to support this good faith defense. Right, I'm not suggesting that you should necessarily be able to put a defense instruction on the front end. I guess I'm just more troubled by the idea, and I understand that the burden of proof, reasonable doubt stuff was all in there. But there's just something that doesn't sit right, it seems to me, about giving those written instructions to the jury to hold on to through this entire trial and then not taking them back at the end. But, Your Honor, I think it comes down to if it was okay for the judge to say it, it has to be okay to reduce it to writing. Our precedents say that the judge could have given a preliminary oral instruction. The judge can give the final written instructions. The only gap is what we've never addressed, what some circuits have addressed, and that is preliminary written instructions. Yes, Your Honor. I think we have your argument, Ms. Krigsman. Thank you. Thank you. Mr. Klug. The question regarding whether issues of standing and whether the scope of a search are evidentiary, the case law and the circuits, 100 percent clear, both are evidentiary issues. Whatever the recused judge's order was would have been subject to appeal on that basis, whatever his ruling was. So the answer, despite its length and despite talking about the way the recused judge resolved it, essentially is yes, there was an evidentiary hearing, and the judge ruled based on what happened at that evidentiary hearing. And so there is no question in this case, there is no question that there was no independent de novo review within the meaning of this court's case law. And that's only one of three grounds of our issues. But that factual question is, at this point, undisputed. The other grounds we raised go to the question itself, the improper transfer of the case. And there is a separate body of case law. And in that context, the prejudice that one must show where you show that something improper has happened, and something improper did happen, and what was it? Are you talking about from Judge Honeywell? Judge Honeywell did nothing. But are you talking about the transfer of the case from Judge Honeywell to Judge Dalton? Is that what you're talking about when you say the improper transfer of the case? Or are you talking about the transfer of the case from Judge Conway to Judge Jarvie, or from Judge Dalton ultimately to Judge Jarvie through Judge Conway? Which one are you talking about? That component of the issue relates to Judge Dalton's consolidation order. Judge Honeywell issued no orders. There's no question that it was a violation. This court has precedent on this issue because a random assignment is not something that people just say. Judge Honeywell consented to it. Judges on the district court are allowed to transfer cases among themselves as long as everybody is in agreement. So I don't see, in the absence of the recusal problem, why is this an issue? And then the recusal problem is dealt with separately with Judge Jarvie. Judge, the court has precedent on this. That's the point. The court has precedent on it, even when it's done right, when it's done just as you just described it. Even when it's done right, there's a violation of the random assignment rules. And when there's a violation of the random assignment rules, there's a risk of prejudice. And to prevail, this court has said, you show that you either had a biased judge or you could have suffered prejudice some other way. I did what was required. I followed the rules. I showed I had a biased judge, that when you rejected Sonolongo's plea, when he denied me the right to file motions, when he cut off my right to file a memorandum of law, when he wouldn't let me present evidence at a hearing, that he was a biased judge. I did what I was supposed to do. I followed the rules. I played by the rules. They did not. They admitted they did not. They agreed with me. Both the order should be vacated. I'm not here to attack Judge Dalton. He may be the greatest guy in the world. I'm here to create a system to establish that this circuit has a system that says we don't have to ask whether he did something wrong. We don't have to go there. We protect everybody. We protect the system. And that's what this court's precedent holds. I showed the prejudice that's required. Okay. Thank you, Mr. Clayton. Mr. Afflew. May it please the Court. This Court has spent years adopting pattern jury instructions. Our pattern jury instructions say that the preliminary instructions are simply preliminary that explain to the jury the basic principles about a criminal trial and their duty as jurors. It goes on to say that at the end of the trial— If we've said you can give preliminary oral instructions, right? Not with the elements. I'm not aware of any precedent that says you can give the jury the checklist up front, and that's the problem. When the government raises this scenario that, oh, maybe they won't want good faith at the end of the trial, so we don't know if we should get it at the beginning, we shouldn't give any of the elements at the beginning. All it does is encourage—this court goes out of its way in many situations, jury questions, for example, to prevent premature deliberations. When you give them the elements up front and give it to them in writing, all you've done is given them a checklist. So they sit there and say, check, check, check, before they even get to the defense case, before they even get to the argument, and that's the problem with giving them the elements up front. I don't understand that. I don't understand the problem that the jury might know why they're hearing certain evidence and whether that actually checks. I don't understand that. It seems to me that it's helpful for a jury to know the relevance of whatever it's having. We pick people off the street to come in and, as a civic duty, listen to something with which they're often completely unfamiliar. And I suspect in a lot of white-collar cases, it could be really bewildering. And to let them know about that ahead of time and to give them a frame of reference, it seems to me, would be a good idea from both the government's and the defense's perspective. Your Honor, I don't doubt that in a lengthy white-collar case, it might be helpful to give them definitions up front. But the problem and why courts don't adopt this, why this court hasn't adopted it, I'm not aware of any court in the country that in their preliminary instruction says it's okay to give the elements up front. It's because the tendency would be for the jury to simply be listening for those elements in the evidence. And as soon as they hear those elements – What if the government doesn't presume? But as you know, Your Honor, and as I know, generally speaking, it's rare that a judgment of acquittal would be granted at the close of the prosecution's case. So usually the government has put on some evidence relating to those elements. But the defense hasn't even presented their case yet. They can refute those elements. But if the juror is given a checklist, in this case literally a written piece of paper that has the elements, they may be checking, checking, checking. And once they get checked to element three, that's the end of it. Their mind may close and they no longer listen to the arguments, to the evidence from the defense, to anything else. In their minds, that's all they needed to get to and that's the end of the case. That's why we don't allow elements to be given up front, Your Honor. Thank you, Mr. Efferman. Thank you. We have that case under submission.